248

REWCO, INC., PLAINTIFF, *v.* CLEVELAND (CITY) ET, DEFENDANTS.

Common Pleas Court, Cuyahoga County.

No. 746360. Decided December 20, 1961.

(Hoddinott, J., of Monroe County, sitting by assignment in Cuyahoga County.)

Hoddinott, J. Plaintiff, a taxpayer, seeks to enjoin the Defendant City and various city officials from proceeding further with a contract to buy fifteen refuse collection truck bodies from Defendant Pucel Enterprises, Inc.

The City uses the same types of closed trucks for both garbage and rubbish collection. The refuse, after being dumped into a rear-end hopper, is mechanically loaded into the body of the truck, where it is compressed.

There are five principal types of refuse bodies on the market: the Leach, which is distributed by The Road Machinery & Supply Company, a corporation closely associated with the Plaintiff; the Roto-Pac, of which Defendant Pucel Enterprises, Inc., is sole distributor in Ohio; and the Daybrook, the Gar Wood and the Heil. These bodies can be classified as either cyclical or continuous loaders.

In a cyclical loader, when the hopper is filled, the attendant pushes a lever, starting the cycle; a door closes up the hopper, a scoop cleans it out and deposits the refuse in the body; then the hopper door opens and reloading can begin. Plaintiff's Leach body is of this type, as are the Gar Wood and Heil bodies.

The continuous loaders are distinguished by moving belts which carry the refuse as soon as it is dumped, from the hopper to the storage space. There is no closing of the hopper while a loading cycle is completed. Examples of the continuous loader are the Roto-Pac of Defendant Pucel Enterprises, Inc., and the Daybrook. The loading belt of the Roto-Pac is of the escalator type—that is, it leaves the hopper at an upward angle. The belt on the Daybrook body is horizontal.

For some years prior to the questioned transaction, the City had used more Leach bodies, furnished by Plaintiff's associated

company, than any other type. In 1959, the City purchased its first five Roto-Pacs for testing purposes from Defendant Pucel Enterprises, Inc. Departmental orders to keep records of repairs and expense of these Roto-Pacs were made, but apparently not carried out.

In June, 1960, the City received bids for twenty packer-type refuse trucks under general specifications which Plaintiff's Leach and Defendant Pucel's Roto-Pac as well as the other standard bodies could meet. City officials wanted to split the order by buying five Leaches and fifteen Roto-Pacs. Defendant Louis L. Drasler, Director of Public Service for the City, testified that the extra Roto-Pacs were desired (they would then compose about ten per cent of the City's fleet) so that an exhaustive study could be made of their worth. Roto-Pacs had been highly recommended to Drasler, he said, during a trip to New York City in 1956.

The City legal department advised that the order for twenty bodies under the 1959 ordinance could not be split among two or more suppliers. Thereupon, the City rejected all bids and readvertised—this time, for five bodies under the previous general specifications, and for fifteen bodies of the "continuous loader type" with "escalator type conveyor," and being " 'Roto-Pac' Model 516E or approved equal."

For the fifteen continuous loader bodies, Defendant Pucel offered the Roto-Pac at $4,699.74 per unit, while Plaintiff's associate company offered the Leach at $3,540.00 per unit. At the meeting of the City's Board of Control when the bids were considered, a letter from Harry C. Ziskind, Commissioner of Streets, to Defendant Drasler, recommending the Roto-Pac body, was read. The contract for fifteen Roto-Pacs was awarded to Defendant Pucel.

Defendant Drasler testified that in his experience as Director of Public Service for the City, specifications for bids had been in the form of a named patented article "or approved equal" on only one other occasion. In September, 1960, the City asked for bids on a York catch basin cleaner "or approved equal." Defendant Pucel Enterprises, Inc., also has the franchise for the York Cleaner.

Section 715.18, Revised Code, provides in part:

". . . nor shall any purchase, construction, alteration, or repair for any of such departments be made or done except on authority of the legislative authority and under Sections 735.05 to 735.09, inclusive, Revised Code, if the cost thereof exceeds one thousand dollars."

The referred to Section 735.05, Revised Code, reads as follows:

"the director of public service may make any contract, purchase supplies or material, or provide labor for any work under the supervision of the department of public service involving not more than one thousand dollars. When an expenditure within the department, other than the compensation of persons employed therein, exceeds one thousand dollars, such expenditure shall first be authorized and directed by ordinance of the legislative authority of the city. When so authorized and directed, the director shall make a written contract with the lowest and best bidder after advertisement for not less than two nor more than four consecutive weeks in a newspaper of general circulation within the city."

The Charter of the City of Cleveland contains this provision:

"Section 108. Authorization of Contracts.

"All contracts involving any expenditure in excess of one thousand dollars ($1,000.00) shall first be authorized and directed by ordinance of Council. When so authorized and directed, the director of the department involved shall make a written contract with the lowest and best bidder, after advertisement once a week for two consecutive weeks in the City Record. There shall be no splitting of orders to avoid the effect of this section, and any contract made contrary to or in evasion of the foregoing provisions of this section, shall be illegal and void."

The pertinent provision from the Codified Ordinances of the City of Cleveland is as follows:

"Section 1.4309 (225). Purchases Exceeding $1,000.00 to be Authorized by Ordinance; Bids; Contracts.

"No purchase amounting to more than One Thousand

Dollars ($1,000.00) except as provided in Section 1.4305 shall be made until authorized and directed by ordinance of Council. After being so authorized and directed by ordinance of Council the Commissioner of Purchases and Supplies, in addition to the posting required in Section 1.4305 hereof, shall cause advertisements for bids to be made in the City Record once a week for two consecutive weeks, and said Commissioner of Purchases and Supplies shall immediately report the bids received to the director of the department involved, who in turn shall transmit such bids with his recommendations thereon to the Board of Control, for consideration at its next regular meeting. Any or all bids may be rejected. No purchase contract shall be awarded without the approval of the Board of Control, and only to the lowest and best bidder. Purchase contracts so approved shall be reduced to writing and signed by the director of the department involved, and no such purchase contract shall be made except it be reduced to writing and entered into pursuant to the ordinances of the City of Cleveland.''

Competition between bidders on public contracts has always been the primary means of protecting the taxpayer. With the development of technology the idea of what competition should be has changed. It is frequently difficult to determine which of several similar, complicated machines will serve the public at the lowest actual cost. The responsibility of the contractor who installs or services the machinery has become of increasing importance. The contracting agency needs a wider latitude for exercise of reasonable discretion. Therefore, the statutes concerning purchasing which at first required bids to be let to the *lowest* bidder, were later amended to specify the *lowest responsible bidder*, and now specify *lowest and best* bidder.

With the right of wider discretion, goes the stricter duty of comparison of the submitted bids. Every reasonable effort should be made to find the bidder who in fact is the best one.

Actually, the appearance of competition in this case is illusory. The Roto-Pac is the only body which would meet the requirements of ''continuous loader type'' and ''escalator type conveyor'' in the specifications.

Under some circumstances the specifications for bids may call for patented materials or articles; otherwise the public would lose the benefit of many valuable technological developments. The Roto-Pac is patented. The municipality has such power only "when it is clearly to the public interest to do so, after carefully considering the serviceability and cost of the material or article for which the contract is made." 10 McQuillin, Municipal Corporations, sec. 2942, page 294. See *Mog* v. *Cleveland* (1915), 18 Ohio N. P. (N. S.), 49; *Tucker* v. *Newark* (1897), 19 Ohio C. C., 1.

The City made no such determination in the instant case. In fact, Defendant Drasler admitted that he had caused the specifications to call for Roto-Pacs so that he could determine the validity of the recommendation of the New York authorities *after* a large number of Roto-Pacs had been bought and used. The value of a patented article should be determined before the specifications are drawn, not after it is bought. The City certainly has facilities for getting this information without making a substantial investment first.

Asking for bids in the alternative is permissible, but the specifications must be accurate and complete as to each alternative. Then, when the bids have been received, the City may select one alternative after careful comparison with the others and award the contract to the lowest and best bidder. *The L & M Properties Co., Inc.* v. *Burke, Mayor, et al.* (1949), 152 Ohio St., 28. The City made no such comparison in the instant case.

The determination of the lowest and best bidder is a matter of judgment, based upon facts. 10 McQuillin, Municipal Corporations, sec. 29.73, page 355. In *Yaryan* v. *Toledo et al* (1906), 28 Ohio C. C., 259, affirmed 76 Ohio St., 584, it is suggested that there be considered:

"1. The quality of the thing, the feasibility of the plan, the efficiency of the things that are to be furnished, etc.

"2. The quality of the bidder, his qualifications, responsibility, etc.

"3. The price, in view of the other considerations."

The National Institute of Municipal Law Officers has promulgated a uniform purchasing ordinance (which has not been

adopted by the City of Cleveland) prescribing the following standards in letting contracts, in addition to price (NIMLO Model Ordinance Service Sec. 2-110[5][b]):

The ability, capacity and skill of the bidder to perform the contract or provide the service required;

Whether the bidder can perform the contract or provide the service promptly, or within the time specified, without delay or interference;

The character, integrity, reputation, judgment, experience and effectiveness of the bidder;

The quality of performance of previous contracts or services;

The previous and existing compliance by the bidder with laws and ordinances relating to the contract or service;

The sufficiency of the financial resources and ability of the bidder to perform the contract or provide the service;

The quality, availability and adaptability of the supplies, or contractual services to the particular use required;

The ability of the bidder to provide future maintenance and service for the use of the subject of the contract;

The number and scope of conditions attached to the bid.

The evidence tends to indicate that Defendant Pucel Enterprises, Inc. is not well equipped to service its product—but even more important, the City did not consider this matter before the contract was awarded.

In the instant case, the discretion in awarding the contract to Defendant Pucel Enterprises, Inc., was not exercised fairly and reasonably within the spirit of the law. 10 McQuillin, Municipal Corporations, sec. 29.72, page 345.

Plaintiff is entitled to a permanent injunction, and may draw an entry in accordance with this opinion.